## DAISY-BELLE PETROLEUM CO. et al. v. THOMAS et al.

No. 19662. Opinion Filed June 16, 1931.

Rehearing Denied July 28, 1931.

Brown & Williams and Biddison, Campbell, Biddison & Cantrell, for plaintiffs in error.

Leahy, Saunders & Walther, Malcolm E. Rosser, and J. L. London, for defendants in error.

KORNEGAY, J. This is a proceeding in error from the district court of Tulsa county, Honorable Luther James being the judge. Case-made, as filed here, shows that the action was begun on the 20th of December, 1920, and that it started in the name of A. R. Thomas and the Trojan Drilling Company, the latter being a corporation, and the Daisy-Belle Petroleum Company, and E. J. Stroman, and V. I. Pucini were defendants.

The briefs that have been filed in the case by the respective parties are very lengthy, embracing in all 390 pages. The record is voluminous, embracing 556 pages, with assignments of error covering several pages of typewritten matter.

The main contention of the plaintiffs in error is that the evidence in the case was not sufficient to support the recovery. The recovery, according to the verdict, is based

on a finding that two strings of tools were converted, and their value was $40,000, and there was deducted the amount that was due on the tools to the Wolverine Oil Company. The verdict is as follows, omitting caption:

"We, the jury impaneled and sworn in the above entitled cause, do, upon our oaths, find the issues for the plaintiffs and fix the amount of their recovery at $40,000. Less amount of draft sum of $4,778.96, balance being $35,221.04.
                    "J. W. Ross, Foreman."

At the time of the negotiations, it was necessary to develop the property, as other wells were being drilled. All parties seem to have worked to a common end of getting a well to the sand as quickly as possible. All parties were engaged in a common enterprise, as part of the pay for the drilling was to be in stock in the Daisy-Belle Petroleum Company. The defendant in error A. R. Thomas was a contract driller and had three sets of drilling tools, and he moved two sets of them on to the oil lease of the defendant Daisy-Belle Petroleum Company, and started to drill two wells there, his business being carried on in the name of the Trojan Drilling Company.

The contract, as originally made, does not call for any payments until the completion of the well, and $6 a foot was the price to be paid. There was a clause inserted in the contract, which was in the form of a letter, for the protection apparently of the owner of the lease, as follows:

"For your protection all bills in connection with this drilling are to come to your office Room 213, Simpson building, Ardmore, Okla.; and you agree to pay all labor and teaming bills when presented, properly approved by our authorized agent, or any other bills you desire to pay when properly approved as above stated."

Both sides claim that this was eliminated, there being some contention as to the circumstances.

Sometime after the parties started on this drilling, in both places, there was a fishing job, in neither of which were they able to get the obstructing tools out, and it resulted in skidding the rigs and putting down another hole at each location.

The briefs in the case diverge somewhat as to what the evidence was, and very strongly do they diverge as to the effect of the evidence.

The health of Mr. Thomas broke down, and he left the field, where he had very closely followed the work, and went to Tulsa, where he lived and from which point he did business. When he left, about May 15th, the superintendent of the Daisy-Belle Petroleum Company was on the ground, and all parties appeared to have been more than anxious to get the work along, and under those conditions this superintendent had been watching the work and trying to urge it along and aiding by friendly suggestions. After the contractor left for Tulsa, and was not able to be on the ground, he sent a driller named McCoy to take charge as foreman. Up to that time the parties were the closest of friends, and from time to time Thomas, the manager and practical owner of the Trojan Drilling Company, from Tulsa, corresponded with the agent of the Daisy-Belle Petroleum Company about the work, and made suggestions as to how to recover the tools, the efforts all parties were making. The Daisy-Belle Petroleum Company was very anxious to get the drilling done, and so was everybody else, according to the testimony.

It appears from the record that there were some bills outstanding, due the Wolverine Oil Company, that had been incurred by Mr. Thomas and the Trojan Drilling Company, while the rigs were on the lease of the Wolverine Oil Company, and that, before the rigs could be moved, it was necessary to pay the Wolverine Oil Company the sum of $4,778.96. This money was paid to the Wolverine people by Mr. Pucini, one of the defendants, and a bill of sale was made to him, reciting a consideration of $4,200, and conveying certain parts of the tools, but not all, that were on the Wolverine property.

There is a dispute between the parties at this time, though apparently none until the litigation arose, as to the purpose of this bill of sale. It is claimed by the defendants in error in the briefs and pleadings that this bill of sale was given for the purpose of enabling V. I. Pucini, one of the defendants and one of the managers of the Daisy-Belle Petroleum Company, to borrow $10,000 in order to pay the bills that were necessary to be paid for labor and supplies, that the Trojan Drilling Company and A. R. Thomas incurred while engaged in the drilling they did for the Daisy-Belle Petroleum Company. The bill of sale was signed in the presence of W. S. Forrest, but does not appear to have been acknowledged.

The preponderance of the evidence indicates that this bill of sale was but a chattel mortgage to secure the amount paid that was due the Wolverine Oil Company, though it is still contended in the briefs of the defendants in error that it was not for the latter purpose, but was given in order

for Pucini to borrow $10,000. However, in the first reply to the answer claiming this to be a chattel mortgage, made to secure the advance to cover the Wolverine bill, there is the following:

"Plaintiffs admit that they gave the defendant V. I. Pucini a bill of sale in the nature of a chattel mortgage, but deny all the other material allegations of paragraph 7."

It is found in the record, at page 33, in the reply to the answer which was filed on the 18th of December, 1925, but apparently was displaced by amended reply that was filed on the 5th of January, 1926, making a general denial.

The testimony appears to be in conflict, as introduced on the trial, as to the purpose of the bill of sale, but this admission, it seems to us, is such that, for the purpose of this case, we must take it as established that the bill of sale was a security for the money advanced, which is dated the 14th of February, 1920, and filed for record May 24, 1920. Besides this, the amount of articles conveyed is scarcely large enough to cover two rigs or to make a showing on which to borrow $10,000.

The contract found on pages 64 and 65 of the case-made, written on a paper dated at 209-10-11 Simpson Building, Ardmore, Okla., shows the office of the Daisy-Belle Petroleum Company to be No. 213 of the same building. It contains an agreement on the part of the petroleum company to pay the labor and teaming bills when presented, if properly approved by the authorized agent of the drilling company, as well as any other bills that the Daisy-Belle Petroleum Company might desire to pay when so authenticated.

On the same page there appears a contract dated the 30th of January, 1920, touching the drilling, and in that Pucini and Stroman, president and secretary of the Daisy-Belle Petroleum Company, agreed to sell Mr. Thomas, the owner of the Trojan Drilling Company, 5,000 shares of the company stock for $7,500, one-half of which was to be paid out of the drilling contract on the first well drilled, and the remainder on the second well, the wells to be drilled in accordance with the custom and prevailing price of the field, and according to the agreement of January 29, 1920, between the Trojan Drilling Company and the Daisy-Belle Petroleum Company. Little, if any, reference is made in the briefs to this.

There was a proviso that the failure as to the drilling of the wells should not work a forfeiture of the contract, and that the money might be paid from other funds than that earned from the drilling of the wells.

The main testimony, on behalf of the plaintiffs, consisted of two depositions, one being of the wife of the plaintiff, A. R. Thomas, and secretary of the Trojan Drilling Company. The depositions appear to have been taken in Los Angeles, Cal., some years ago, and after the parties had lived there something like a year and ten months, moving there from Tulsa, Okla.

As we view it, in cases of this character, where the plaintiff seeks to recover damages for conversion, in an unlawful use of tools, it becomes highly essential to find out what the parties said and did, as indicative of their purpose in using the tools for the conversion of which suit is brought. We know of no better way of ascertaining those things than by viewing the contentions of the parties before the controversy arose and while the work was being performed. It unquestionably appears, from the circumstances of this case, that both the contractor, Mr. Thomas, who expected to get an interest in the Daisy-Belle Petroleum Company, as a result of a successful performance on his part, by getting down the wells to the producing sand, and Mr. Pucini and Mr. Stroman were all interested very deeply in the success of the project, and were not only willing, but did all that each thought he could do, to promote this success. It is true that their joint efforts resulted in a temporary failure, but there is nothing in this record to indicate that anybody especially was culpably responsible for the failure. However, under the terms of the contract, the Daisy-Belle Petroleum Company was not obligated to pay for the drilling, unless the sand was reached.

If the testimony of the plaintiff, A. R. Thomas, can be relied upon, there was no conversion or interference with the property warranting a verdict in his favor, and the testimony of his wife falls short of establishing facts from which a liability for the value of the tools could be fastened on defendants, when the correspondence introduced in evidence is considered. Most clearly there was no wrongful dominion exercised by defendants over the tools. It is clearly established that the amount advanced to relieve the tools and get them from the Wolverine Company was never repaid, and the jury so found by the plain expression in the verdict. However, that perhaps is not controlling here, even though the law allowed the lienholder to have possession. The controlling fact here is that the owner wanted the tools used, as they were to carry out his contract concerning

the adventure embarked on, and he was not able to be present on account of ill health, and was no longer able to finance the proposition. He was more than gratified that his friends and co-adventurers should carry on the work, the managing of which and the mental strain from which prevented his coming back, and caused his nervous breakdown.

The testimony of the owner, however, does not show trover or conversion in this case. Conversion, in a legal sense, is defined by Webster's International Dictionary, as follows:

"Law—An appropriation of, and dealing with, the property of another as if it were one's own, without right, as the conversion of a horse."

Webster's International Dictionary defines "trover" as follows:

"Law—a. Lit. a finding; hence any coming into possession. b. Orig. An action of trespass on the case to recover damages against one who found goods, and would not deliver them to the owner on demand; hence, in modern common law, an action which lies in any case to recover the value of goods wrongfully converted by another to his own use. In this case, the finding, though necessary to be alleged, is an immaterial fact; and not necessary to be proved, the conversion or wrongful detention being considered to be the gist of the action."

Court cases without number may be cited, and Words and Phrases and any Current Digest will enlarge the definition without stint, but it is not deemed necessary to review them.

In the present case, the making of the drilling contract is admitted, and affirmative relief was asked on account thereof, and profits were asked for. It was in the contract that the Daisy-Belle Petroleum Company, to protect itself, could pay all the bills. It was to the interest of Mr. Thomas, the plaintiff, as a prospective stockholder, that the work should go on. It was his duty as a contractor for the work to go on. He directed his associates to skid the rig and go on. Everybody wanted to go on. They did go on, and the wells were completed, though the cost exceeded the contract price. The verdict in this case exceeded by $10,000 the estimate put on the value of the property by their own expert witness, Mr. Ross, as disclosed on page 188, when he estimates the value of each string at $14,000 to $15,000.

Whether the objection of defendants' attorneys, or the suspicion of plaintiffs' attorneys, in any way influenced such a verdict, we are unable to reason out. However, we do not think the verdict should be allowed to stand. The cause is reversed, with directions to the lower court to award a new trial. The defendants in error are taxed with the costs of the proceeding in error.

LESTER, C. J., CLARK, V. C. J., and RILEY, HEFNER, CULLISON, and McNEILL, JJ., concur. SWINDALL and ANDREWS, JJ., absent.